# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AMY WALSH,                      )

             **Plaintiff,**     )

                       )     **Civil Action No. 13-00189**

     **vs.**               )     **Chief Magistrate Judge Maureen P. Kelly**

                       )

                       )     **Re: ECF No. 44**

**UNIVERSITY OF PITTSBURGH,**  )

**JUDY MERMIGAS,**         )

**MICHAEL NEFT, and**       )

**JOHN O'DONNELL**         )

             **Defendants.**  )

## OPINION

**KELLY, Chief Magistrate Judge**

Pending before the court is a Motion for Summary Judgment (ECF No. 44) filed by

Defendants the University of Pittsburgh ("Pitt"), Judy Mermigas ("Mermigas"), Michael Neft

("Neft"), and John O'Donnell ("O'Donnell") (collectively "Defendants"). Plaintiff Amy Walsh

("Walsh") initiated this action on February 5, 2013, by filing a five-count Complaint in Civil

Action (ECF No. 1) alleging: (i) disability discrimination under Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12131, *et seq*. ("ADA") and (ii) disability discrimination under

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*. ("Rehabilitation Act") against

Pitt; (iii) defamation and (iv) intentional infliction of emotional distress ("IIED") against

Mermigas, Neft, and O'Donnell; and (v) negligent infliction of emotional distress ("NIED")

against all Defendants. On April 15, 2013, Defendants filed an Answer and Affirmative

Defenses. (ECF Nos. 4-7).

On April 1, 2014, after an unsuccessful attempt to mediate, Plaintiff was granted leave to

file an Amended Complaint. (ECF No. 30). Plaintiff filed the Amended Complaint on April 9,

2014, adding a sixth claim for breach of contract against Pitt. (ECF No. 31). On April 23, 2014,

Defendants filed a responsive Answer and Affirmative Defenses. (ECF Nos. 32-35). On July 3, 2014, following the close of discovery, Plaintiff filed an uncontested motion seeking permission to withdraw counts (iii) and (iv), for defamation and IIED respectively. (ECF No. 41). Defendants filed a Motion for Summary Judgment and a brief in support on July 17, 2014. (ECF Nos. 44 and 45). Defendants also submitted a concise statement of material facts (ECF No. 46) and seven volumes of supporting exhibits. (ECF Nos. 47-53). Plaintiff filed her concise statement of material facts with supporting exhibits (ECF No. 55) on August 22, 2014, accompanied by a Response Brief in Opposition to Defendant's Motion for Summary Judgment. (ECF No. 56). Defendants filed a reply brief (ECF No. 58) and response to Plaintiff's concise statement of material facts (ECF No. 60) on September 11, 2014. Finally, Plaintiff filed a sur-reply brief (ECF No. 62) on September 22, 2014.

After consideration of the parties' submissions and the applicable legal principles, the Court concludes that in light of the summary judgment standard of review and based upon the evidence of record, Plaintiff cannot prove that her dismissal from the University of Pittsburgh's Nurse Anesthesia Master's Program was the result of unlawful discrimination under either the ADA or the Rehabilitation Act, or that she was harassed under either law. Further, Plaintiff cannot prove that Defendants' conduct leading up to Plaintiff's release constituted a breach of any contractual duty or resulted in any damages to her. Finally, Plaintiff cannot prove either the sort of contractual or fiduciary duty or the existence of a direct physical injury caused by Defendants' allegedly negligent conduct necessary to support a claim for NIED in Pennsylvania. Accordingly, for the following reasons, Defendants' Motion for Summary Judgment (ECF No. 44) will be GRANTED.

# I.       FACTUAL AND PROCEDURAL BACKGROUND

The factual background is derived from the undisputed evidence of record and the disputed evidence, viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").

Walsh graduated from Pitt in mid-1998 with a B.S. in psychology and a B.A. in anthropology.  (ECF No. 55, ¶ 2).  In late 2004, she obtained a B.S. in nursing, from Pitt (ECF No. 55, ¶ 3) and in the summer of 2011 Walsh was later accepted into Pitt's Nurse Anesthesia Master's Program (the "Program").  (ECF No. 55, ¶ 4).  The Program is described in the "Nurse Anesthesia Program Student Handbook" (the "Handbook"), which explains that the curriculum consists of 52 didactic credits and 60 equivalent credits of clinical practice over a 28 month period.  (ECF No. 48, p. 39, ¶ 7; ECF No. 55).  Walsh performed well in the didactic portion of the Program.  (ECF No. 55, ¶ 8).  The clinical portion of the Program requires students to rotate through affiliated clinical sites and anesthesia related specialty areas while receiving individualized instruction from certified registered nurse anesthesiologists ("CRNAs") and anesthesiologists.  (ECF No. 48, p. 45; ECF No. 55, ¶ 7).  At least one of these CRNAs or physicians acts as a site coordinator at each clinical site with responsibilities that include providing feedback to students through the use of daily evaluations and a Rotation Summary Evaluation of Clinical Performance ("Rotation Summary") conducted at the conclusion of each clinical practicum.  (ECF No. 49, p. 2; ECF No. 55, ¶¶ 11, 18, 19).   This Rotation Summary provides an evaluation of the student's performance in each of five areas: 1) organization/preparation; 2) clinical knowledge base; 3) technical skills; 4) management of

anesthetics; and 5) professionalism/motivation.  (ECF No. 53, p. 2; ECF No. 55, ¶ 19).  In each

of these five categories, the student can receive a classification of superior, satisfactory, or

unsatisfactory.  Id.  After factoring in the evaluations for each of these individual categories, a

student must receive an overall grade of satisfactory to move on to the next practicum.  (ECF No.

48, p. 45; ECF No. 55, ¶ 9).

Walsh received "satisfactory" marks in all five categories of the Rotation Summary for

her first clinical practicum, which took place at UPMC Passavant between November of 2011

and March of 2012.  (ECF No. 53, p. 2; ECF No. 55, ¶¶ 18, 20).  Walsh then moved on to her

second site, the Veterans Affairs Medical Center ("VA") in the Oakland section of Pittsburgh,

Pennsylvania, where she worked from March through May of 2012.  (ECF No. 55, ¶ 21).  During

her time at the VA, Walsh revealed to Sally Ollio ("Ollio"), one of her clinical coordinators at

the site, and Diane Boettger ("Boettger") that she had a medical history of breast cancer and

related surgical treatment (ECF No. 55, ¶ 28), which Walsh claims to have resulted in mild

weakness and a reduced range of motion in her left arm and persistent joint stiffness.  (ECF No.

55, ¶ 26).  Walsh further claims that this weakness and limited range of motion causes her to

move and perform certain manual tasks in a different manner than her nursing peers.  (ECF No.

55, ¶ 27).  According to Walsh, she chose to reveal this information following an incident during

which she was mask ventilating a patient under Boettger's instruction, and Boettger grabbed

Walsh's arm and attempted to twist it into what Boettger considered to be proper form for the

procedure.  (ECF No. 55, ¶ 217; ECF No. 55-1, p. 16).

Walsh says that, after informing Boettger that Walsh's left arm could not move in the

manner Boettger wished it to, Boettger, Ollio, and Dr. Mohr, one of the anesthesiologists at the

VA, began making comments that Walsh would be unable to perform in the role of a CRNA due to her physical limitation. (ECF No. 55, ¶¶ 219-22). Walsh claims that she brought concerns about this allegedly harassing conduct by the VA employees to the attention of Defendants Mermigas, Neft, and O'Donnell on multiple occasions, and that these concerns were dismissed. (ECF No. 55, ¶¶ 223-27, 231-32). As a result of having to endure the environment at the VA, Walsh says she developed depression and anxiety for which she was prescribed antidepressant and anxiolytic medications. (ECF No. 55, ¶ 233). Walsh's depression caused her to lose twenty pounds during her next clinical rotation, and she feels ill whenever she discusses her time at the VA or has to travel to Pittsburgh. (ECF No. 55, ¶ 234; ECF No. 55-1, 75-77). On the Rotation Summary for the VA, Ollio rated Walsh as "satisfactory" in four of the five categories, with a rating "somewhere between satisfactory and unsatisfactory" in the area of technical skills. (ECF No. 55, ¶¶ 22, 23).

Despite, Walsh's less than satisfactory mark for technical skills for her time at the VA, she received an overall grade of "satisfactory," allowing her to then move on in June of 2012 to her next clinical site, UPMC Shadyside Hospital ("Shadyside"). (ECF No. 55, ¶ 34). Walsh had three clinical coordinators during her clinical practicum at Shadyside: Amy Herrmann ("Herrmann"), Vince Contendo ("Contendo"), and Bob Lorh. (ECF No. 55, ¶ 35). Very early on during her time at Shadyside, Walsh attended a meeting with her faculty advisor, Defendant Neft, and the director of the Program, Defendant O'Donnell, which was organized in response to reports from Shadyside concerning Walsh's performance there. (ECF No. 55, ¶ 42). Students having difficulty at a clinical site may be placed onto a performance improvement plan ("PIP") in an effort to correct perceived shortcomings. (ECF No. 55, ¶ 41). On or around July 6, 2012,

following the meeting with Neft and O'Donnell, Walsh was placed on such a PIP.  (ECF No. 52, pp. 14-16; ECF No. 55, ¶ 43).  This PIP contained six overall goals, dealing with organization, maintaining focus and composure, demonstrating attention to detail, communicating effectively, and handling constructive criticism.  (ECF No. 52, p. 15).

Walsh says that the hostility she perceived from members of the VA staff was perpetuated by several of the CRNAs at Shadyside, including Hermann, who unjustifiably criticized her performance and attempted to portray her as incompetent.  (ECF No. 55, ¶¶ 235-38).  Again, Walsh says she brought concerns about this behavior to Defendants Mermigas, Neft, and O'Donnell on several occasions, who took no action but rather told Walsh that the behavior she was experiencing was a normal part of the nursing profession and that Walsh should learn to accept personal accountability.  (ECF No. 55, ¶¶ 240-43, 246-47).

Near the end of Walsh's rotation at Shadyside, O'Donnell, Neft, and Contendo met with her to inform her that, while she showed some improvement against the goals stated in the PIP, additional improvement was still necessary, and therefore she would remain on a revised PIP during her next clinical rotation.  (ECF No. 55, ¶ 49).  In her Rotation Summary for Walsh, which was completed in late August of 2012, Herrmann evaluated Walsh as "unsatisfactory" in the areas of organization/preparation, management of anesthetics, and professionalism/motivation, with the remaining two areas graded as "satisfactory."  (ECF No. 55, ¶¶ 37-39).  Ultimately, Walsh received a "G" grade for her clinical practicum at Shadyside, (ECF No. 55, ¶ 50), which is given when a class is incomplete with extenuating circumstances and can be improved to a "satisfactory" once the student is found to have met certain goals.  (ECF No. 49, pp. 45-46; ECF No. 55, ¶ 51).  Walsh received a letter from Neft on September 4, 2012,

which summarized the situation as it existed at that point, including a discussion of the "G" grade and the revised PIP, and restated the same goals at the first PIP. (ECF No. 52, pp. 39, 42; ECF No. 55, ¶ 12). The letter explained that Walsh was being placed on probation until at least the end of the fall 2012 term. (ECF No. 52, p. 40).

Shortly after receiving the September 4th letter, Walsh began what would be her final clinical practicum at UPMC St. Margaret ("St. Margaret") (ECF No. 55, ¶ 53), and continued there until her last day of active participation on October 18, 2012. (ECF No. 55, ¶ 66). On that day, Walsh committed two separate medication errors which necessitated her completion of a "Clinical Event Report." (ECF No. 52, p. 48; ECF No. 55, ¶ 67). The first of those errors was a "near miss" in which her supervising CRNA, Laura Kridler ("Kridler"), had to intervene to prevent Walsh from administering the drug labetalol when she had been instructed to administer the drug ketamine. (ECF No. 52, p. 48; ECF No. 55, ¶¶ 68, 74). The second of those errors occurred ten minutes later, when in response to an instruction to administer labetalol, Walsh began to administer the drug fentanyl, and had actually administered approximately 10-15 mcg of the 5 ml dose before the CRNA noticed the error. (ECF No. 52, p. 48; ECF No. 55, ¶¶ 68, 69). Walsh met with O'Donnell and a Pitt School of Nursing faculty member, Joseph Goode, to discuss these events the following day. (ECF No. 55, ¶ 70). The parties disagree as to whether Walsh was able to suggest what she would do differently in the future to prevent such errors when asked by O'Donnell. (ECF No. 55, ¶¶ 72, 251-52). Following that meeting, O'Donnell discussed the incident with the clinical faculty at St. Margaret, who gave the opinion that Walsh was not functioning safely at St. Margaret. (ECF No. 55, ¶ 73).

As the October 18, 2012 incident arguably constituted "Unsafe Student Clinical Performance," O'Donnell referred to School of Nursing Policy 305 ("Policy 305"), as required by the Handbook (ECF No. 49, p. 17; ECF No. 55, ¶ 77), which provides in great detail the procedure through which potentially unsafe student conduct is reviewed.  (ECF No. 50, pp. 8-11).  Policy 305 begins by stating that "[s]tudents whose clinical practice is determined to be dangerous, or potentially dangerous to patients or others will be dismissed from the School of Nursing."  (ECF No. 50, p. 8).  "[M]edication errors . . . that could result in serious injury or death" are included as one of the two examples of "unsafe behavior" which would require "immediate faculty intervention to protect patients or others."  (ECF No. 50, p. 8).  Policy 305 requires that once a faculty member makes a professional judgment that a student's behavior is dangerous or potentially dangerous, he must immediately relieve the student of direct patient care responsibilities and communicate his concerns to "the Associate Dean for Clinical Education."  (ECF No. 50, p. 9).

In this case, O'Donnell communicated his concerns about the October 18, 2012 incident to Susan Albrecht ("Albrecht"), Associate Dean for External Relations at the Pitt School of Nursing, who was handling Associate Dean for Clinical Education Sandra Engberg's ("Engberg") responsibilities, during her absence.  (ECF No. 55, ¶¶ 86-88).  This triggered Policy 305's three-level review process, which began with a letter sent to Walsh by Albrecht on October 24, 2012, informing Walsh that she had been suspended from clinical activities in the Program. (ECF No. 50, p. 6; ECF No. 55, ¶ 76).

At Policy 305's first level of review, the Associate Dean for Clinical Education must determine whether she agrees with the initial faculty member's judgment that the relevant

student behavior was dangerous or potentially dangerous, and whether there were any mitigating circumstances present. (ECF No. 50, p. 9). If the Associate Dean disagrees with the initial assessment of the student's behavior, the suspension is lifted. Id. In the first alternative, if she agrees but finds mitigating circumstances, she must work with a defined team to determine the conditions under which the suspension will be lifted. Id. Finally, if she agrees and finds no mitigating circumstances, the next level of review is triggered, and a Faculty Review Panel ("Panel") must then review the judgment. Id. The determination to be made by the Panel is essentially the same, although mitigating circumstances are not explicitly mentioned as a consideration. (ECF No. 50, p. 10). The final level of review occurs only if the Panel agrees that the student's behavior was dangerous or potentially dangerous, and is prompted by the Assistant Dean for Clinical Education's recommendation to the Dean that the student be dismissed. Id. The Dean still has the ability to lift the suspension should she disagree with the lower findings. Id. However, if she concurs with the original faculty member, the Associate Dean for Clinical Education, and the Panel, the Dean must communicate the student's dismissal from the school. Id.

On November 12, 2012, once the Policy 305 review process was completed in the instant matter, Jacqueline Dunbar-Jacob ("Dunbar-Jacob"), the Dean of Nursing, sent Walsh a letter explaining that, at each level of review, the judgment that Walsh had engaged in "unsafe practice that was potentially dangerous to the patient" was upheld. (ECF No. 50, p. 34). As such, Walsh was dismissed from the Program effective as of that date. Id. This occurred even though, early on at St. Margaret, Walsh was exceeding expectations. (ECF No. 51, p. 13). However, the Rotation Summary for this site ultimately completed by Kridler on November 30, 2012, reflected

four "unsatisfactory" grades, with only one "satisfactory" mark in professionalism/motivation. (ECF No. 52, p. 45; ECF No. 55, ¶ 61).

Walsh now argues that the Defendants breached a contractual duty created by Policy 305, which required that Walsh's past clinical performance not be considered in making the determination that her conduct on October 18, 2012, was dangerous or potentially dangerous, and which resulted in her dismissal from the Program. (ECF No. 56, pp. 3-13). Walsh also argues that Pitt breached its contract with her because the decision to dismiss her was either arbitrary or made in bad faith. (ECF No. 56, pp. 14-18). Walsh next asserts that Pitt subjected her to unlawful harassment, and that the decision to dismiss her from the Program was based on her disability, in violation of both the ADA and Rehabilitation Act. (ECF No. 56, pp. 18-27). Finally, Walsh claims that she suffered severe emotional distress caused by the negligent conduct of Defendants during her time in the Program. (ECF No. 56, pp. 27-31).

## II.      STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48 (emphasis in original). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).

An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America</u>, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>, 963 F.2d 599, 600 (3d Cir. 1992). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1). <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323. <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.  Breach of Contract Claim

With respect to Walsh's claim for breach of contract, Pitt argues they are entitled to judgment as a matter of law because Walsh "has failed to adduce evidence to support any of the elements of her . . . claim." (ECF No. 45, p. 16).  Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages."  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)).  While there is a genuine issue as to whether the terms of Policy 305 represented part of a contract between Walsh and Pitt, Walsh has failed to produce evidence such that a reasonable jury could find either that Pitt breached a contractual duty or that Walsh incurred any damages as a result of any such breach.

### 1.  Existence of a contract.

"With respect to disputes between students and private schools[,] Pennsylvania Courts apply a contract law analysis," Hart v. Univ. of Pittsburgh, No. 13-399, 2014 WL 4218616, at *18 (W.D. Pa. Aug. 25, 2014), and "[t]he contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution," Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. 1999).  While there is still an open question in Pennsylvania as to whether Pitt, as a "state-related institution pursuant to the University of Pittsburgh – Commonwealth Act, 24 P.S. §§ 2510-202(6)," is a public entity such that its

12

handbook does not form a contract with students, <u>Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.</u>, 91 A.3d 723, 730 n.12 (Pa. Super. 2014), neither party has argued that Pitt's status impacts the analysis here in any way or that Policy 305 is not part of an enforceable contract. Further, the Pennsylvania Superior Court has observed that Pitt "should not expect to use its unique state-related status to avoid any obligation to its students under either due process or contract law." <u>Id.</u> at 731. As such, we will presume that Policy 305 spells out the detailed procedure which Pitt has a contractual duty to provide to students whose conduct is alleged by faculty to be dangerous or potentially dangerous.

### 2. No duty was breached by Pitt.

Having concluded that a contract exists here, the next element of a breach of contract claim that Walsh must show is an actual breach of a duty imposed by that contract. Here, the duty at issue is described by Policy 305, which details the procedure that must be afforded Program students who are accused of unsafe clinical performance. (ECF No. 50, pp. 9-11). Walsh asserts that Policy 305 "contains an express limitation on when past performance may be considered and states that past performance may only be considered when determining the *response* to unsafe behavior." (ECF No. 56, pp. 5-6) (emphasis in original). Walsh argues that Pitt faculty breached this duty by considering her past clinical performance in determining whether to dismiss her for her conduct on October 18, 2012. (ECF No. 56, p. 5). After reviewing the language of Policy 305, we find that its terms do not create a duty to not consider past performance, and therefore no such duty was breached by Pitt.

Policy 305 begins by stating the overarching policy that "[s]tudents whose clinical practice is determined to be dangerous, or potentially dangerous to patients or others *will be*

*dismissed* from the School of Nursing." (ECF No. 50, p. 8) (emphasis added). Throughout Policy 305, "the words 'dangerous' and 'unsafe' are used interchangeably." (ECF No. 55, ¶ 129). In its "Procedure" section, Policy 305 spells out in great detail the process by which an initial faculty member's professional judgment concerning a student's conduct is reviewed at three escalating levels. (ECF No. 50, pp. 9-11). In order for a student to be dismissed, reviewers at each level must concur that the student's behavior was dangerous or potentially dangerous. (See ECF No. 50, pp. 9-10). Policy 305 explains that "[t]his procedure is intended to review the specific judgment," but "**[a] student's prior performance (clinical or didactic)** may . . . be taken into consideration when determining the response to the unsafe behavior. (ECF No. 50, p. 9) (emphasis in original). Walsh reads these provisions together to mean that whenever a student's behavior is determined to be dangerous or potentially dangerous, she *must* be dismissed, and therefore "a student's past performance may only be considered in situations where the response to the conduct can be something other than mandatory dismissal," i.e., *not* dangerous or potentially dangerous. (ECF No. 56, p. 10). Taking Policy 305 in its entirety, this reading is untenable.

"The interpretation of a contract is a question of law," Seven Springs Farm, Inc. v. Croker, 748 A.2d 740, 744 (Pa. Super. 2000), and "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties," Lesko v. Frankford Hosp.- Bucks Cnty., 15 A.3d 337, 342 (Pa. 2011). As Walsh points out, "[w]hen the language of a contract is unambiguous, as is the case here, '[the court] must interpret its meaning solely from the contents within its four corners, consistent with its plainly expressed intent.'" (ECF No. 56, p. 7 (quoting Seven Springs Farm, Inc., 748 A.2d at 744)). Of course, "courts should not

14

interpret a contract so as to lead to an absurd result." Washington Twp. Mun. Auth. v. Am. Arbitration Ass'n, 429 A.2d 728, 730 (Pa. Super. 1981). Walsh's proposed interpretation of Policy 305 would lead to such an absurd result.

The procedure of Policy 305 is only triggered "[w]hen a faculty member makes a professional judgment that [a] student's behavior is dangerous or potentially dangerous to patients or others." (ECF No. 50, p. 9). At the first level of review of this judgment, the Associate Dean for Clinical Education not only has the option of concurring or dissenting that the student's conduct was dangerous, but may also consider whether mitigating circumstances exist such that corrective measures taken against the student may be less severe than dismissal from the Program. Id. These mitigating circumstances, which may be considered when determining the response to what would otherwise be unsafe behavior, may include the student's prior clinical performance. Id. It is not possible to square Walsh's assertion that a student who is found to have demonstrated unsafe behavior *must* be dismissed from the Program under Policy 305 with the policy's explicit permission to consider prior performance in determining the response to unsafe behavior. If the only permitted response to unsafe conduct was dismissal, the evaluation of past performance and other mitigating circumstances that the drafters of Policy 305 chose to include would be pointless.

A better reading of Policy 305 is that reviewers of the initial faculty member's professional judgment must limit their initial review to whether the student's behavior was, in fact, dangerous or potentially dangerous in the specific instance. If, at any of the three levels of review, the reviewer(s) disagree with the lower finding of dangerousness, the student is returned to clinical practice. If, however, the reviewer(s) agree that the student's conduct was unsafe,

mitigating circumstances, including the student's past clinical performance, may then be considered as part of the determination of corrective action. If no mitigating circumstances are found, the student must be dismissed. Given this framework, the only duty that can be inferred with regard to the consideration of past clinical performance, if there is one, is one not to consider it until the specific student behavior at issue has been determined to be dangerous or potentially dangerous on its own.

Here, Walsh has offered no evidence that Pitt faculty improperly considered her prior clinical performance as part of the determination of whether her conduct on October 18, 2012 was unsafe. Policy 305 only became relevant initially because O'Donnell made the professional judgment, in consultation with the clinical faculty at St. Margaret, that Walsh's conduct was dangerous or potentially dangerous to the patient. (ECF No. 55, ¶ 81). At the first level of review of this judgment, Albrecht concurred with O'Donnell's assessment. (ECF No. 55, ¶ 94). The faculty review panel required next by the policy "agreed with the determination that Walsh's conduct was unsafe." (ECF No. 55, ¶ 99). Finally, at Policy 305's last level of review, Dunbar-Jacob "concurred with the findings at each level that Walsh's behavior was dangerous or potentially dangerous to patients." (ECF No. 55, ¶ 104). Walsh has neither alleged nor offered proof that any of the reviewers improperly considered her prior clinical performance as part of the determination of whether her October 18, 2012 conduct was unsafe or that reviewers would not have found this specific conduct to have been dangerous or potentially dangerous without considering her prior performance. With no genuine issue as to whether Pitt breached a contractual duty owed to Walsh, summary judgment for Pitt is proper on this claim.

### 3. Walsh would have suffered no damages due to a breach of the duty alleged.

Even if the court were to find that Pitt breached the duty alleged by Walsh -- one not to consider past performance when student conduct is determined to be unsafe -- Walsh would be unable to prove the third element of a breach of contract claim or that she suffered damages as a result of the breach. Damages claimed by a plaintiff in a breach of contract action must be a proximate consequence of the breach. Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987). Here, Walsh has not alleged any such damages, nor could she given the nature of the claimed breach. Walsh argues that Pitt breached its duty created by Policy 305 when faculty considered her prior clinical performance in determining whether to dismiss her for unsafe conduct. (ECF No. 56, p. 10). Specifically, Walsh asserts that "past performance cannot be considered where a student's conduct is found to be dangerous or potentially dangerous at every step of the process . . . because dismissal is the only response available." Id. Based on this analysis, given that Walsh's conduct on October 18, 2012 was found to be unsafe at every level of Policy 305 review, there would have been no choice but to dismiss Walsh from the Program. The only result of the breach of a duty not to consider Walsh's prior performance and instead dismiss her immediately would have been that reviewers gave more consideration to her situation than was required, as the ultimate outcome would have still been Walsh's dismissal. As Walsh is unable to prove that she suffered damages as a result of Pitt's breach of the duty she alleges, summary judgment in Pitt's favor on the breach of contract claim is proper.

**4. The decision to dismiss Walsh was rational and had a reasonable basis in fact.**

Walsh also argues that "a university may be liable for a breach of contract for its academic decisions where evidence suggests that (a) no professional judgment was actually exercised, (b) the university acted arbitrarily or capriciously, or (c) the university acted in bad faith or with ill will."  (ECF No. 56, p. 14) (citing <u>Swartley v. Hoffner</u>, 734 A.2d 915 (Pa. Super. 1999)).  This is a misapprehension of the law.  At the point in its opinion when the <u>Swartley</u> court provided the analysis summarized by Walsh as quoted above, it was discussing the review of university decisions from a due process standpoint, not a breach of contract.  In <u>Swartley</u>, the Superior Court of Pennsylvania explained that:

> "[w]hen judges are asked to review the substance of a genuinely *academic decision* . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."

<u>Swartley</u>, 734 A.2d at 921 (quoting <u>Regents of Univ. of Michigan v. Ewing</u>, 474 U.S. 214, 225 (1985) (emphasis added).  Specifically, when reviewing academic decisions, courts must "determine whether there is no rational basis for the university's decision or whether the decision was motivated by bad faith or ill will unrelated to academic performance."  <u>Id.</u> at 921.

An alternative analysis applies to *disciplinary* determinations by universities.  <u>See</u> <u>Bd. of Curators of Univ. of Missouri v. Horowitz</u>, 435 U.S. 78, 87 (1978).  Such decisions, made for reasons unrelated to academics, require additional procedure for the protection of student rights, including a hearing before the relevant school authority.  <u>Id.</u> at 87-88.

Walsh makes no argument that Pitt's decision to dismiss her for unsafe conduct during her clinical assignment was actually a disciplinary decision entitled to process beyond what she

received, nor would that argument have been successful had it been made. Procedure employed to make disciplinary determinations is sufficient if it provides for, "effective notice and informal hearing permitting the student to give his version of the events." Id. at 89. Here, through the procedure contained within Policy 305, Walsh was notified of the of the action pending against her by the October 24, 2012 letter from Albrecht, (ECF No. 55, ¶ 89), given the opportunity to testify at the October 30, 2012 faculty review panel, (ECF No. 55, ¶¶ 98, 151-61), and notified of the ultimate action taken against her by the November 12, 2012 letter from Dunbar-Jacob. (ECF No. 55, ¶ 104). This procedure would clearly have satisfied Walsh's due process rights.

Reviewing Pitt's decision to dismiss Walsh from the Program under the very deferential standard applied to academic decisions is no more favorable to Walsh. Walsh argues that the medication errors she committed on October 18, 2012, did not cause the patient actual harm, and therefore were not dangerous or potentially dangerous. (ECF No. 56, p. 15). Also attempting to undermine the rationality of a determination that her conduct was unsafe, Walsh has offered evidence which could show that the patient would have suffered no harm even had Kridler not prevented her from administering the entire dose of the incorrect medication. Id. In an effort to highlight possible arbitrariness or ill will in Pitt's decision, Walsh has also provided evidence of numerous other students who committed medication errors, some arguably more serious than Walsh's, but were not disciplined under Policy 305. Id.; (ECF No. 55, ¶¶ 177-216, 258-60). Having reviewed all of this evidence in the light most favorable to Walsh, we cannot find that Pitt's decision to dismiss Walsh was either irrational or motivated by bad faith or ill will unrelated to her academic performance. See Swartley, 734 A.2d at 922.

The determination that must be made in order to dismiss a student from the Program under Policy 305 is that the student's behavior was "dangerous, or *potentially* dangerous." (ECF No. 50, p. 9) (emphasis added). Actual harm is not required. It is not difficult to imagine that the exact same behavior exhibited by Walsh on October 18, 2012, in administering the incorrect medication could result in serious danger, or even death, to a patient. (See ECF No. 55, ¶ 255 (O'Donnell stating that Walsh's error could have been "catastrophic")). As such, the determination that Walsh's conduct was at least potentially dangerous is clearly not irrational. Walsh's other evidence of students who were treated less severely than she was for arguably equivalent conduct is insufficient to prove either that Pitt's decision to dismiss Walsh was irrational or motivated by ill will. Without more, the fact that others were treated differently is inadequate to support a finding that a university's decision to dismiss a student after a three-tiered review process was based on anything but that student's academic performance. As Walsh has failed to offer evidence which would support a rational finding that Pitt's decision to dismiss her was irrational or based on ill will unrelated to her academic performance, summary judgment must be granted in favor of Pitt.

## B. ADA and Rehabilitation Act Claims

Walsh's claims against Pitt for discrimination based on her disability under the ADA and Rehabilitation Act each actually contain two separate sub-claims, one for discriminatory denial of the benefits of the Program and another for disability-based harassment. While each of these sub-claims has a different set of elements which must be separately evaluated, each can be jointly analyzed under both the ADA and Rehabilitation Act because both of "the[ir] substantive standards for determining liability are the same." McDonald v. Com. of Pa., Dep't of Pub.

Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir. 1995).[1]  As discussed below, even when viewing the facts and drawing all reasonable inferences in Walsh's favor, she has failed to establish a prima facie case of either discrimination or harassment.

**1. Disability discrimination under the ADA and Rehabilitation Act.**

The McDonnell Douglas burden-shifting analysis applies to claims of discriminatory treatment under the ADA and Rehabilitation Act.  Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 667-68 (3d Cir. 1999).

> Briefly summarized, the McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).  To establish a prima facie case of disability discrimination and meet the first prong of the McDonnell Douglas framework, Walsh must demonstrate that she "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the [P]rogram or was otherwise subject to discrimination because of her disability."  Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009).

Under both the ADA and Rehabilitation Act, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." McDonald v. Com. of Pa., Dep't of Pub. Welfare, Polk Ctr., 62 F.3d at 95.  Walsh argues that her disability consists of mild weakness and a reduced range of motion in her left arm and persistent

---

[1] The Rehabilitation Act does require the additional showing that the allegedly discriminating program receives federal financial assistance, 29 U.S.C. § 794(a), but there is no dispute that this element is satisfied by Pitt.

joint stiffness as a result of certain surgeries she underwent for the treatment of breast cancer. (ECF No. 55, ¶ 26). Because of these conditions, Walsh says that she moves and performs certain tasks differently than her nursing peers. (ECF No. 55, ¶ 27). While it does not seem clear that Walsh's alleged limitations rise to the level of being "substantial limitations" as required by the ADA and Rehabilitation Act, Pitt has conceded that Walsh has a disability for the purposes consideration of the Motion for summary judgment.

Assuming that Walsh has satisfied the first element of a prima facie case of discrimination, she must now demonstrate that she "was otherwise qualified to participate in a school program." Chambers, 587 F.3d at 189. "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Se. Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979). Pitt argues extensively that Walsh was not otherwise qualified to participate in the Program, as evidenced by numerous unsatisfactory evaluations of Walsh's performance independently conducted by her supervisors prior to the events of October 18, 2012. (ECF No. 45, p. 10). Pitt relies upon el Kouni v. Trustees of Boston Univ. for the proposition that "in considering whether someone is 'otherwise qualified' to participate in a post-secondary academic program, a certain degree of deference is owed to the judgement [sic] of an academic institution." (ECF No. 45, p. 7) (quoting el Kouni v. Trustees of Boston Univ., 169 F. Supp. 2d 1, 4 (D. Mass. 2001)). This reliance is misplaced.

In el Kouni, the court was dealing with a university's decision to dismiss a graduate student for his poor performance in his academic program. See el Kouni, 169 F. Supp. 2d at 4. As this determination dealt only with the academic performance of its students, the university's decision to dismiss el Kouni was one that was owed deference. Id.; see Swartley, 734 A.2d at

921. However, to the extent that <u>el Kouni</u> stands for a proposition that a court should defer in any way to a university's determination that a student is not "otherwise qualified" for the purposes of ADA and Rehabilitation Act discrimination analyses, it is a proposition this court finds unpersuasive. While the purely academic decisions of universities deserve deference in a due process context, if such deference were extended to situations requiring a separate discrimination analysis, universities could insulate even actions taken for discriminatory reasons by claiming that the student was not otherwise academically qualified. Instead, when a student claims she was discriminated against, courts must independently evaluate whether the student has shown she is otherwise qualified to participate in the academic program.

In this case, despite the fact that Walsh had received multiple unsatisfactory evaluations (ECF No. 55, ¶ 38) and was on her second PIP (ECF No. 55, ¶ 58), Pitt found Walsh to be qualified to participate in the Program initially (ECF No. 55, ¶ 4) and never made a subsequent determination that Walsh was academically incapable of meeting the requirements of the Program. Walsh's ultimate dismissal was in response to the events of October 18, 2012, not Walsh's academic performance. Further, Pitt had never suggested that Walsh's physical limitations would prevent her from meeting the requirements of the Program. Walsh has therefore met her burden of showing that she was otherwise qualified to participate in the Program.

Having satisfied the first two elements of a prima facie case of discrimination, Walsh must finally show that she "was denied the benefits of the program or was otherwise subject to discrimination because of her disability." <u>Chambers</u>, 587 F.3d at 189. Walsh satisfies this element by asserting that Pitt dismissed her from the Program because of her disability. (ECF

No. 56, p. 23).  Under the <u>McDonnell Douglas</u> framework, now that a prima facie case has been

established, "the burden shifts to [Pitt] to articulate some legitimate, nondiscriminatory reason

for the employee's rejection."  <u>Jones</u>, 198 F.3d at 410.  Pitt meets this burden by explaining that

Walsh was dismissed from the Program under Policy 305 due to Walsh's dangerous or

potentially dangerous conduct consisting of the two medication errors she committed on October

18, 2012.  (ECF No. 45, p. 12).  The burden now shifts once more, and Walsh must show that the

legitimate reason offered by Pitt was not its true reason, but was instead a pretext for

discrimination.  <u>Jones</u>, 198 F.3d at 410.

> At this final stage of the burden-shifting analysis,
>
> a plaintiff may defeat a motion for summary judgment (or judgment as a matter of
> law) by pointing "to some evidence, direct or circumstantial, from which a
> factfinder would reasonably either: (1) disbelieve the employer's articulated
> legitimate reasons; or (2) believe that an invidious discriminatory reason was
> more likely than not a motivating or determinative cause of the employer's
> action."

<u>Shaner v. Synthes</u>, 204 F.3d 494, 501 (3d Cir. 2000) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759,

764 (3d Cir. 1994)).[2]  In an effort to meet this burden, Walsh extensively discusses Pitt faculty

inaction and lack of empathy in response to concerns she alleges she repeatedly raised about

disability-based harassment she was suffering at clinical sites.  (ECF No. 56, pp. 24-26).  Walsh

also provides evidence that several other students who committed medication errors, some

arguably more serious than her own, were not terminated under Policy 305.  (ECF No. 56, p. 16

(citing ECF No. 55, ¶¶ 177-216, 258-260)).  Even viewing all of these facts and drawing all

---

[2] In another relevant distinction between the ADA and Rehabilitation Act, a plaintiff under the ADA must only
prove "that the illicit factor played a role in the employer's decisionmaking process and that it had a determinative
effect on the outcome of that process."  <u>Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.</u>, 60 F.3d 153, 158
(3d Cir. 1995).  Such a "mixed-motives" analysis is not available in Rehabilitation Act cases.  Discrimination must
be the "but-for" cause of adverse action.  <u>See</u> 29 U.S.C. § 794(a).  As will be discussed, this distinction will not
affect the analysis here.

reasonable inferences based on them in Walsh's favor, she has failed to provide sufficient

evidence such that a reasonable factfinder could either disbelieve that Pitt dismissed Walsh

because of her dangerous conduct or believe that the decision to do so was, at least in part,

motivated by disability discrimination.

Viewing the evidence presented by Walsh in a vacuum, it is possible to imagine that

Walsh could have been treated differently because of her disability and that her supposed

violation of Policy 305 was merely a pretext for her actually discriminatory dismissal.

Incorporating the remaining undisputed evidence into the analysis reduces this possibility to

purely a metaphysical one. While it is clear that Walsh was punished more severely than several

other students due to medication errors, no evidence has been offered to support a reasonable

finding that this was because of her disability. To the contrary, during the three year period

leading up to Walsh's dismissal seven other students, who were not disabled, were also

dismissed from the Program or otherwise disciplined and one disabled student who was placed

on a PIP went on to successfully graduate from the Program. (ECF No. 55, ¶¶ 108-111).

Further, the judgment that Walsh's multiple medication errors on October 18, 2012, was

dangerous or potentially dangerous was reviewed by a three-tiered process in which five

individual faculty members concurred. Without much more, Walsh has failed to satisfy either

prong of the <u>Fuentes</u> test, and summary judgment in favor of Pitt with respect to Walsh's

disability discrimination claim must be granted.

### 2. Disability-based harassment under the ADA and Rehabilitation Act.

To establish a prima facie case for harassment based on disability, Walsh must show that:

(1) [she] is a qualified individual with a disability under the ADA; (2) she was
subject to unwelcome harassment; (3) the harassment was based on her disability

or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [Pitt] knew or should have known of the harassment and failed to take prompt effective remedial action.

Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999). While there are genuine issues of material fact concerning most of these elements, Walsh has not met her burden of providing evidence sufficient for a reasonable jury to find that any harassment she endured was sufficiently severe or pervasive.

Once again, the Court will presume that Walsh is a qualified individual with a disability under the ADA as Pitt has not disputed that Walsh is disabled, and there is sufficient evidence to find that she was still qualified to take part in the Program until the point when she was dismissed. Walsh has also alleged multiple instances in which she was subjected to what could be considered harassing conduct based on her physical limitations.[3] Finally, there is a genuine issue of material fact as to whether Pitt faculty knew about this harassment and failed to take action.[4] However, even construing all of the facts and inferences in Walsh's favor as we have, there is no such genuine issue concerning the severity of the harassment Walsh says she faced.

To determine whether the harassment Walsh says she endured was sufficiently severe or pervasive, "we must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[3] Walsh offers several examples of allegedly unwelcome harassment. First, she mentions the incident in which Boettger twisted Walsh's arm while Boettger was supervising Walsh perform a procedure on a patient. (ECF No. 55, ¶ 217). Second, Walsh discusses multiple occasions during her time at the VA when Boettger, Mohr, and Ollio made comments to the effect that Walsh would be unable to perform as a CRNA due to her disability. (ECF No. 55, ¶¶ 219-20, 222). Third, Walsh asserts that certain daily evaluations of her while at the VA referenced her physical limitations. (ECF No. 55, ¶ 228). Finally, Walsh claims that Hermann and several other CRNAs at Shadyside unjustifiably criticized Walsh's performance during her time there. (ECF No. 55, ¶¶ 235-6).

[4] Walsh alleges that she spoke to Mermigas, Neft, and O'Donnell numerous times about the conduct she was enduring at the VA and Shadyside, but either no action was taken or blame was placed on Walsh. (ECF No. 55, ¶¶ 223-7, 231-2, 240-3, 245-7).

offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Walton v. Mental Health Ass'n. of Se. Pa., 168 F.3d at 667 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). At best, Walsh has described a series of isolated comments relative to performance that took place intermittently over a period of several months in the Program that neither threatened nor humiliated Walsh nor prevented her from participating in the Program. This is inadequate to support a jury's reasonable finding that Walsh endured sufficiently severe harassment. Therefore, summary judgment of Walsh's disability-based harassment claim in favor of Pitt is appropriate.

### C. Negligent Infliction of Emotional Distress Claim

Walsh alleges in her final claim that she suffered emotional distress with physical manifestations as the result of Defendants' negligence. Specifically, Walsh says that Defendants negligently caused her depression and anxiety which have manifested physically as a twenty pound weight loss and intense nausea when she is forced to recall these events or travel to Pittsburgh. (ECF No. 56, p. 28). Additionally, Walsh includes the physical pain she suffered when Boettger twisted her arm to a proper position for a procedure as a physical impact of Defendants' supposed negligence. To recover under a theory of NIED, "a plaintiff must establish the elements of a negligence claim, *i.e.*, that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." Toney v. Chester Cnty. Hosp., 961 A.2d 192, 198 (Pa. Super. 2008). In Pennsylvania,

> the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing

a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 217 (Pa. Super. 2012) (citing Doe v.

Philadelphia Community Health Alternatives AIDS Task Force, 745 A.2d 25, 26 (Pa. Super.

2000)).  Here, Walsh bases her claim on scenarios (1) and (2) as identified by the court in Toney.

    **1.   NIED based on a contractual or fiduciary relationship between Walsh and Defendants.**

Pennsylvania courts have limited NIED claims based on contractual or fiduciary duties

"to preexisting relationships involving duties that obviously and objectively hold the potential of

deep emotional harm in the event of breach. . . . [T]hese special relationships must encompass an

implied duty to care for the plaintiff's emotional well-being."  Weiley, 51 A.3d at 218 (citing

Toney v. Chester Cnty. Hosp., 36 A.3d 83, 95 (Pa. 2011).[5]  "The potential emotional harm must

not be the type that a reasonable person is expected to bear.  Compensable emotional harm has

been described as likely to be experienced as a visceral and devastating assault on the self, such

that it resembles physical agony in its brutality."  Toney, 36 A.3d at 95.  Since first allowing

NIED claims based on breach of a contractual or fiduciary relationship, Pennsylvania courts have

found only certain doctor/patient relationships and one between an adoption agency and adoptive

parents to support such a claim, refusing to extend liability further.  Hershman v. Muhlenberg

Coll., No. 13-7639, 2014 WL 1661210, at *4 (E.D. Pa. Apr. 24, 2014).  Given the development

of the law in this area, we agree with the court in Hershman which found that, "the relationship

between a college and its students does not obviously hold the potential of deep emotional

harm," and will not support a claim for NIED by a student against a college.  Id.

---

[5] As the court in Weiley explained, Toney is persuasive even though it lacks precedential value because the Pennsylvania Supreme Court was evenly divided in rendering its decision.  Weiley, 51 A.3d at 217 n.16 (Pa. Super. 2012).

Walsh's NIED claim based on her contractual or fiduciary relationship with the Defendants ultimately fails for three reasons. First, based on the discussion above, there is no duty of care owed to Walsh by Defendants, because their relationship is not one "involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach." See Weiley, 51 A.3d at 218. Second, even if such a duty existed, Walsh has failed to allege any facts which would support a reasonable finding that Defendants breached that duty. Beyond Walsh's single statement that "Plaintiff suffered a physical impact as a result of Defendants' negligence" (ECF No. 56, p. 27), there are no additional facts plead and no discussion of facts which might somehow prove, how Defendants' conduct may have fallen below the appropriate standard of care. Without such an explanation, we are unable to independently glean support for this essential element from the record. Third and finally, the emotional distress Walsh claims to have suffered does not approach the level of visceral or agonizing pain which Toney suggested could be compensable. See Toney, 36 A.3d at 95. Because no reasonable jury could find that Walsh proved the essential elements of her NIED claim based on her contractual or fiduciary relationship with Defendants, summary judgment on this claim in Defendants' favor must be granted.

**2. NIED based on physical impact.**

Walsh argues separately that, regardless of whether a contractual or fiduciary duty was owed to her by Defendants, her NIED claim is supported by the physical impact she suffered as a result of Defendants' conduct. Specifically, Walsh points to her twenty pound weight loss, nausea allegedly triggered by thinking of her time in the Program, and the physical pain she experienced when Boettger twisted her arm to a position proper for a procedure, as the physical

impacts of Defendants' negligence.  (ECF No. 56, ¶ 28).  While Pennsylvania law has expanded

to allow recovery for NIED in circumstances in which there was no contemporaneous physical

injury, Pennsylvania courts "have long permitted recovery of emotional distress damages that are

accompanied by direct physical injury caused by a defendant's negligence." Shumosky v.

Lutheran Welfare Servs. of Ne. Pa., Inc., 784 A.2d 196, 200 (Pa. Super. 2001) (discussing the

"zone of danger" and "bystander" rules).  Despite being able to point to supposed physical

manifestations of Defendants' conduct, Walsh's NIED claim based on physical impact still must

fail for two reasons.

First, as discussed above with respect to the NIED claim based on Walsh's contractual or

fiduciary relationship with Defendants, Walsh has failed to carry her burden of producing

evidence sufficient for a reasonable jury to find that Defendants' conduct fell below a reasonable

standard of care.  Even with a demonstrable physical impact, the elements of negligence still

must be proven to successfully recover under this theory of NIED, see Toney, 961 A.2d at 198,

and Walsh has presented no evidence of a breach of duty of a reasonable standard of care by

Defendants.  Second, Walsh's physical impacts are not of the type necessary to permit a recovery

for NIED.  Under the physical impact theory, for a physical impact or injury to support a claim

of NIED it must have been the direct cause of negligence by the defendant, occurring prior to or

contemporaneous with the resultant emotional distress.  In such a case, a plaintiff can then

"recover for the emotional distress that consequentially flow[s] from this alleged physical

injury."  Shumosky, 784 A.2d at 201.

Here, most of Walsh's alleged physical impacts, including weight loss and nausea,

actually flow from the alleged emotional distress, including anxiety and depression.  Such

physical impacts will not support a claim for NIED under this theory of recovery. In

Pennsylvania, plaintiffs who claim even severe physical manifestations of emotional distress are

consistently denied recovery through NIED when they are unable to trace their emotional

distress to a prior or contemporaneous physical injury which occurred due to the defendant's

negligence. See Doe, 745 A.2d at 25; Lubowitz v. Albert Einstein Med. Ctr., 623 A.2d 3 (Pa.

Super. 1993); Brown v. Philadelphia Coll. of Osteopathic Med., 760 A.2d 863 (Pa. Super. 2000).

The only physical impact that Walsh alleges to have preceded her emotional distress is the pain

caused when Boettger allegedly twisted her arm to a proper position. When a plaintiff sustains

even a trivial or minor bodily injury "which [is] accompanied by fright or mental suffering

directly traceable to the peril in which the defendant's negligence placed the plaintiff, then

mental suffering is a legitimate element of damages." Shumosky, 784 A.2d at 201-02. It is clear

that in this case, however, Walsh cannot reasonably trace her mental suffering and the physical

symptoms thereof to the relatively innocuous interaction with Boettger. Once again, with

insufficient evidence for a reasonable jury to find that Walsh satisfied the essential elements of

her NIED claim based on physical impact, summary judgment will be granted in favor of

Defendants.

**IV. CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 44) filed on

behalf of Defendants is properly GRANTED.  An appropriate order will be entered.

BY THE COURT:


/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE


cc:  All counsel of record by Notice of Electronic Filing